IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 22-cr-00225-REB

UNITED STATES OF AMERICA,
        Plaintiff,

v.

HASSAN McGLOTTEN,
        Defendant.

## MOTION TO DISMISS THE INDICTMENT UNDER THE SECOND AMENDMENT

Hassan McGlotten respectfully moves this Court to dismiss the sole count of the Indictment against him because 18 U.S.C. § 922(g)(1) is facially unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* marks a significant shift in Second Amendment law, first by instructing courts to consider *only* "constitutional text and history" when deciding Second Amendment challenges to an individual's right to keep and bear arms, 142 S. Ct. at 2128-2129, and second by placing a heavy burden on the government to show that a law restricting Second Amendment rights "is consistent with the Nation's historical tradition of firearm regulation," *id.* at 2129-2130.  Here, because felon dispossession laws are of 20th century vintage and not firmly rooted in either the Second Amendment's text or in any cognizable founding-era historical tradition, the government will be unable to meet that burden with respect to any applications of 18 U.S.C. § 922(g)(1)—thereby rendering the statute facially unconstitutional and requiring this Court to dismiss the indictment.

## **LEGAL BACKGROUND**

**I.     The Supreme Court Made Clear in *Heller* that the Second Amendment Protects an Individual Right to Keep and Bear Arms.**

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment" and concluded that the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586, 592. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. Two years later, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (warning that the right to keep and bear arms should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

*Heller* did not involve felon dispossession statutes; rather, the statutes directly at issue in the case were District of Columbia laws prohibiting the possession of handguns in the home and requiring that any other guns in the home be kept inoperable. *Heller*, 554 U.S. at 628-634. But in explaining that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626, the Court noted in dicta that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and

the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-627. But even as it so noted, the Court acknowledged that it did "not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* The Court later went on to remark that "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field." *Id.* at 635.

## II. Before *Bruen*, Lower Courts Assessed Second Amendment Challenges by Applying Means-End Scrutiny.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step required the government to "justify its regulation by establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally, understood," "based on its historical meaning." *Id.* at 2126 (citations and quotations omitted). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then applied the appropriate form of means-end scrutiny—either strict or intermediate, depending on the specifics of the challenged regulation. *Id.* at 2126-2127. Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See id.*

## III. *Bruen* Replaced Means-End Balancing with a Test Rooted Solely in the Second Amendment's "Text and History."

*Bruen* disavowed that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S.

3

Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138. Specifically, *Bruen* explains that (1) a statute prohibiting conduct covered by the plain text of the Second Amendment is presumptively unconstitutional, unless (2) the government can prove that there is either a historical tradition of "distinctly similar" regulations (in the case of "general societal problem[s] that [have] persisted since the 18th century"), *id.* at 2131, or "relevantly similar" analogues (in the case of "unprecedented societal concerns or dramatic technological changes"), *id.* at 2132 (quotation omitted).

### A. Conduct Covered by the Plain Text of the Second Amendment Is Presumptively Constitutional.

Under *Bruen*, courts must first analyze whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* In other words, a law that infringes upon conduct covered by the plain text of the Second Amendment is presumptively unconstitutional. For example, in *Bruen*, the Court "ha[d] little difficulty concluding" that "the Second Amendment protects carrying handguns publicly for self-defense," *id.* at 2134, as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *id.*

### B. It Is the Government's Burden to Show that Any Law Infringing on Presumptively Constitutional Conduct Is Consistent with the Nation's "Historical Tradition of Firearm Regulation."

*Bruen* places a heavy burden on the government to prove that any law infringing on presumptively constitutional conduct "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130; *see id.* at 2135 (same). Indeed, "the government may not simply posit that [a] regulation promotes an

4

important interest." *Id.* at 2126. Rather, the government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130; 2141 *n*.11; 2149 *n*.25.  This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-2132 (cleaned up). If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 *n*.11.

*Bruen* also sets forth certain guideposts for courts to follow when evaluating such historical evidence. First, it provides temporal guidance as to when the historical tradition must have been established. Specifically, the Court stated that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791,[1] when the Second Amendment was ratified. *See id.* at 2135-2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-2132.

---

[1] *Bruen* declined to decide whether "courts should primarily rely on the prevailing understanding of an individual right" in 1791 (when the Bill of Rights was ratified) or 1868 (when the Fourteenth Amendment was ratified). *Bruen*, 142 S. Ct. at 2138 (citations omitted). Mr. McGlotten asserts that the relevant historical tradition is that which existed in 1791, especially as he is not challenging any state statute. But even if the key date were 1868, Mr. McGlotten would still be entitled to relief because there is no historical tradition of felon disarmament at that time either. *See supra*, Argument Section II.B (explaining that felon dispossession statutes are of 20th century vintage).

5

For example, historical evidence that long *predates* 1791 may reflect "linguistic or legal conventions" that were "changed in the intervening years," or "ancient practice[s]" that were "never . . . acted upon or accepted in the colonies." *Id.* at 2136 (internal quotation omitted). Likewise, the farther *forward* in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137. While evidence of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," *id.* at 2136 (internal quotation omitted), courts must "guard against giving postenactment history more weight than it can rightly bear," *id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see id.* ("[T]o the extent later history contradicts what the text says, the text controls.")

Second, *Bruen* differentiates between challenged regulations that address a "general societal problem that has persisted since the 18th century," *id.* at 2131, and challenged regulations that "implicat[e] unprecedented societal concerns or dramatic technological changes," *id.* at 2132. The Court explained that in the former situation, the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a ***distinctly similar*** historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected

6

>on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131 (emphasis added). When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.*

Finally, *Bruen* emphasizes that, whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. *See id.* at 2132, 2137 (quotation omitted). A handful of "outlier[]" statutes, or cases from a small number of "outlier jurisdictions," do not make out a historical tradition. *Id.* at 2153, 2156. The Supreme Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142.

## ARGUMENT

**I.     Following *Bruen*, Mr. McGlotten's Constitutional Challenge Is Properly Before this Court.**

As a threshold matter, Mr. McGlotten's constitutional challenge to 18 U.S.C. § 922(g)(1) is properly before this Court and is not foreclosed by Tenth Circuit precedent. Mr. McGlotten recognizes that the Tenth Circuit has previously disallowed similar challenges to § 922(g)(1). *See United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009). But because the reasoning in *McCane* is obsolete after *Bruen*, which made clear the approach courts must take when evaluating the constitutionality of restrictions on Second Amendment rights, his challenge is

7

properly before the Court. *Accord United States v. Rahimi*, Case: 21-11001, *2 (5th Cir., Feb. 2, 2023) (finding 18 U.S.C. §922(g)(8) facially unconstitutional after applying *Bruen*'s test despite an earlier determination that the statute would pass constitutional muster under the means-end balancing approach).

In *McCane*, the Tenth Circuit rejected a challenge to the constitutionality of 18 U.S.C. § 922(g)(1) based entirely on the dicta in *Heller* that indicated that nothing in the case "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *McCane*, 573 F.3d at 1047 (quoting *Heller*, 554 U.S. at 626). But whatever force that dicta held when *Heller* was first decided, it has dissipated after *Bruen*, and it no longer commands the result in *McCane*. *Cf. McCane*, 573 F.3d at 1047 (Tymkovich, J., concurring) (noting the difference between the then-recent dicta in *Heller* and dicta "enfeebled by later statements").

That dicta does not foreclose Mr. McGlotten's challenge for several reasons. First, the question of felon dispossession was not before the Court in *Heller*, and so its dicta related to felon dispossession was not closely related to its holding. Indeed, even when it was first decided, there was some concern by the Tenth Circuit that the felon dispossession dicta undermined *Heller*'s own reasoning. *See McCane*, 573 F.3d at 1048-1049 (Tymkovich, J., concurring) (characterizing the "felon dispossession dictum" as "the opinion's *deus ex machina* dicta" because it "may lack the 'longstanding' historical basis that *Heller* ascribes to it"). Second, *Bruen* now makes clear that such concern was well-founded, as the *Heller* Court's felon dispossession dicta is clearly inconsistent with the correct test for evaluating Second Amendment challenges. *Bruen* demands a rigorous historical analysis based on founding-era tradition. But the Court in

*Heller* prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." 554 U.S. at 626; *see Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (noting that the *Heller* Court "explicitly deferred analysis of this issue"). The Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Adam Winkler, *Heller's Catch-22*, 56 U.C.L.A. L. Rev. 1551, 1567 (2009).

In fact, the *Heller* Court expressly saved the task of "expound[ing] upon the historical justifications" for situations like the possession of firearms by felons "if and when" those situations came before it. *Heller*, 554 U.S. at 635. And as explained in detail below, felon dispossession laws are *not* longstanding—at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted such a law until the 20th century, and Congress did not pass the federal statute at issue here until 1938. *Heller*'s discussion of "longstanding" felon-disarmament laws, therefore, is not just dicta, but dicta based on a factually incorrect premise. Such an unsupported assertion cannot survive *Bruen*.   Finally, lower courts are not categorically bound by Supreme Court dicta, especially cursory dicta like this that is unaccompanied by further analysis. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498-2499 (2022) (finding entirely unpersuasive prior "tangential" dicta that did not analyze the relevant statute). While it may be true that "nothing in [*Heller*] . . . cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, *Bruen*'s clear

framework does. Therefore, Mr. McGlotten's challenge is not inconsistent with Tenth Circuit precedent and is properly before this Court.

## II. 18 U.S.C. § 922(g)(1) Is Facially Unconstitutional Because Mere Possession of a Firearm by a Felon Is Covered by the Plain Text of the Second Amendment, and There Was No Historical Tradition of Felon Dispossession in the Founding Era.

A statute is facially unconstitutional if it "violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (quotation omitted). In the Second Amendment context, this means that a restriction on protected conduct—such as possession of a firearm by a felon—is facially unconstitutional if the government cannot demonstrate that at least some applications of the restriction are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  Under the framework announced in *Bruen*, § 922(g)(1) violates Mr. McGlotten's Second Amendment right to keep and bear arms. Because the amendment's "plain text" does not differentiate between convicted felons and other members of "the people," a total prohibition on firearm possession by felons therefore presumptively violates the Second Amendment. The government will be unable to rebut that presumption. Felon dispossession laws, which did not appear in this country until the 20th century, were unknown to the founding generation. There was no "historical tradition," as of 1791, of barring felons from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted.

### A. The Plain Text of the Second Amendment Covers Possession of Firearms by Felons.

As discussed above, *Bruen* directs courts to begin the Second Amendment

analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. It does in Mr. McGlotten's case.  First, the Second Amendment protects the right of "the people" to "keep and bear Arms." U.S. Const. amend. II. Possession of a firearm, the conduct proscribed by § 922(g)(1), clearly qualifies as "keep[ing]" and "bear[ing]" arms. *See Heller*, 554 U.S. at 628-629.  Likewise, Mr. McGlotten is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it also does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text," *id.*, suggests that those who have been convicted of a felony are unentitled to the amendment's protection.  *Heller* plainly supports this conclusion. Construing the words "the people" in that case, the Court said, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth and Tenth Amendments—"belongs to all Americans." *Id.* at 580-581. Interpreting "the people" to exclude felons would conflict with that principle. *See Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (pointing out that *Heller* interprets "the word 'people' as referring to 'all Americans'" and that "[n]either felons nor the mentally ill are categorically excluded from our national community").

      The government has elsewhere argued that felons are not part of "the people" for purposes of the Second Amendment because *Heller* refers to "law-abiding" citizens. But that argument misinterprets *Heller*. The *Heller* Court merely acknowledged that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates

11

above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. This language does not limit the Second Amendment right to non-felons (nor does it define "law-abiding"). By beginning the passage with "whatever else it leaves to future evaluation," the Court made clear that it was merely establishing a Second Amendment floor, not a ceiling. *Bruen* further dispels any ambiguity as to this point. The *Heller* language references the right of "law-abiding, responsible citizens" to use arms "in defense of hearth and home." *Id.* If that passage were meant to demarcate the outer limits of the Second Amendment right, then *no one* would have a right to use firearms outside the home. But *Bruen* held that the Second Amendment right *does* extend outside the home. *Bruen*, 142 S. Ct. at 2134.[2]

### B. The Government Will Not Be Able to Show that § 922(g)(1) Is Part of the Nation's Historical Tradition of Firearm Regulation.

Because "the Second Amendment's plain text covers [Mr. McGlotten's] conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that § 922(g)(1) is designed to address—*i.e.*, ex-felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.* The

---

[2] Mr. McGlotten recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *See* 142 S. Ct. at 2156. But that is because the petitioners alleged that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of petitioners' license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*.

government will be unable to make that showing.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251). At that time, the statute "covered only a few violent offenses." *Id.* It was not until 1961 that Congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, in *Bruen*, the Court said it would not even "address any of the 20th-century historical evidence," since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Even if the Court broadens its focus to consider state statutes as well, the government will not be able to support its burden to show a historical tradition of firearm regulation distinctly similar to § 922(g)(1). In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Similarly, a law professor at the University of

13

California, Davis, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).  Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see* Winkler, 56 UCLA L. Rev. at 1563 ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); *accord* Larson, 60 Hastings L.J. at 1376 ("An originalist argument that sought to identify 1791 . . . analogues to felon disarmament laws would be quite difficult to make.").

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *See Bruen*, 142 S. Ct. at 2130-31. The "Founders

themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by violent felons. *See id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "is unconstitutional." *See id.* Nor can the government attempt to justify § 922(g)(1) by resorting to "analogical reasoning," as that mode of analysis is available only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.* at 2132. But the potential danger posed by felons' access to firearms would have been neither unprecedented nor unimaginable to the Founders. As a result, the government cannot rebut the presumption of unconstitutionality by identifying a "relevantly similar" "historical analogue" to § 922(g)(1). *Id.* at 2132-2133. And even if such analogical reasoning were appropriate in this case, it would not aid the government. Mr. McGlotten is unaware of a historical tradition of founding-era statutes that are "relevantly similar" to § 922(g)(1).

## CONCLUSION

Because the government cannot shoulder its burden of rebutting the presumption of unconstitutionality, § 922(g)(1) violates the Second Amendment, and the Court should dismiss the Indictment.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ *Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
Stephanie_Snyder@fd.org
Attorney for Defendant

15

**CERTIFICATE OF SERVICE**

   I hereby certify that on February 3, 2023, I electronically filed the foregoing ***Motion to Dismiss the Indictment Under the Second Amendment*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

  Laura Cramer-Babycz, Assistant United States Attorney
  Email:  laura.cramer-babycz@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

  Hassan McGlotten (via U.S. Mail)


         s/ *Stephanie Snyder*
         STEPHANIE SNYDER
         Assistant Federal Public Defender
         633 17th Street, Suite 1000
         Denver, CO  80202
         Telephone: (303) 294-7002
         Stephanie_Snyder@fd.org
         Attorney for Defendant